# NASHVILLE GAS CO. *v.* SATTY

No. 75–536.   Argued October 5, 1977—Decided December 6, 1977

*Charles K. Wray* argued the cause and filed briefs for petitioner.

*Robert W. Weismueller, Jr.*, argued the cause and filed a brief for respondent.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner requires pregnant employees to take a formal leave of absence. The employee does not receive sick pay while on pregnancy leave. She also loses all accumulated job seniority; as a result, while petitioner attempts to provide the employee with temporary work upon her return, she will be employed in a permanent job position only if no employee presently working for petitioner also applies for the position. The United States District Court for the Middle District of Tennessee held that these policies violate Title VII of the Civil

---

*Briefs of *amici curiae* urging affirmance were filed by *Ruth Bader Ginsburg, Marjorie Mazen Smith, Joel Gora*, and *Judith Lichtman* for the American Civil Liberties Union et al.; and by *Stephen I. Schlossberg, John A. Fillion, J. Albert Woll*, and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations et al.

Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1970 ed., and Supp. V). 384 F. Supp. 765 (1974). The Court of Appeals for the Sixth Circuit affirmed. 522 F. 2d 850 (1975). We granted certiorari, 429 U. S. 1071, to decide, in light of our opinion last Term in *General Electric Co.* v. *Gilbert,* 429 U. S. 125 (1976), whether the lower courts properly applied Title VII to petitioner's policies respecting pregnancy.

Two separate policies are at issue in this case. The first is petitioner's practice of giving sick pay to employees disabled by reason of nonoccupational sickness or injury but not to those disabled by pregnancy. The second is petitioner's practice of denying accumulated seniority to female employees returning to work following disability caused by childbirth.[1] We shall discuss them in reverse order.

I

Petitioner requires an employee who is about to give birth to take a pregnancy leave of indeterminate length. Such an employee does not accumulate seniority while absent, but

---

[1] Respondent appears to believe that the two policies are indissolubly linked together, and that if one is found to violate Title VII the other must likewise be found to do so. Respondent herself, however, has not taken this tack throughout the course of her lawsuit. In the District Court she attacked not only the two policies at issue before us, but in addition petitioner's requirement that she commence her pregnancy leave five weeks prior to the delivery of her child, the termination of her temporary employment allegedly as retaliation for her complaint regarding petitioner's employment policies, and the lower benefits paid for pregnancy as compared to hospitalization for other causes under a group life, health, and accident policy paid for partly by petitioner and partly by its employees. The District Court concluded that respondent had not proved any of these practices to be violative of Title VII, and respondent did not appeal from that determination. Petitioner appealed from the District Court's conclusion that the two company policies presently in issue violate Title VII.

instead actually loses any job seniority accrued before the leave commenced. Petitioner will not hold the employee's job open for her awaiting her return from pregnancy leave. An employee who wishes to return to work from such leave will be placed in any open position for which she is qualified and for which no individual currently employed is bidding; before such time as a permanent position becomes available, the company attempts to find temporary work for the employee. If and when the employee acquires a permanent position, she regains previously accumulated seniority for purposes of pension, vacation, and the like, but does not regain it for the purpose of bidding on future job openings.

Respondent began work for petitioner on March 24, 1969, as a clerk in its Customer Accounting Department. She commenced maternity leave on December 29, 1972, and gave birth to her child on January 23, 1973. Seven weeks later she sought re-employment with petitioner. The position that she had previously held had been eliminated as a result of bona fide cutbacks in her department. Temporary employment was found for her at a lower salary than she had earned prior to taking leave. While holding this temporary employment, respondent unsuccessfully applied for three permanent positions with petitioner. Each position was awarded to another employee who had begun to work for petitioner before respondent had returned from leave; if respondent had been credited with the seniority that she had accumulated prior to leave, she would have been awarded any of the positions for which she applied. After the temporary assignment was completed, respondent requested, "due to lack of work and job openings," that petitioner change her status from maternity leave to termination in order that she could draw unemployment compensation.

We conclude that petitioner's policy of denying accumulated seniority to female employees returning from pregnancy leave violates § 703 (a) (2) of Title VII, 42 U. S. C. § 2000e–2 (a) (2)

(1970 ed., Supp. V). That section declares it to be an unlawful employment practice for an employer to

> "limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's . . . sex . . . ."

On its face, petitioner's seniority policy appears to be neutral in its treatment of male and female employees.[2] If an employee is forced to take a leave of absence from a job because of disease or any disability other than pregnancy, the employee, whether male or female, retains accumulated seniority and, indeed, continues to accrue seniority while on leave.[3] If the employee takes a leave of absence for any other reason, including pregnancy, accumulated seniority is divested. Petitioner's decision not to treat pregnancy as a disease or disability for purposes of seniority retention is not on its face a discriminatory policy. "Pregnancy is, of course, confined to women, but it is in other ways significantly different from the typical covered disease or disability." *Gilbert,* 429 U. S., at 136.

---

[2] The appearance of neutrality rests in part on petitioner's contention that its pregnancy leave policy is identical to the formal leave of absence granted to employees, male or female, in order that they may pursue additional education. However, petitioner's policy of denying accumulated seniority to employees returning from leaves of absence has not to date been applied outside of the pregnancy context. Since 1962, only two employees have requested formal leaves of absence to pursue a college degree; neither employee has returned to work at petitioner.

[3] The District Court found that even "employees returning from long periods of absence due to non-job related injuries do not lose their seniority and in fact their seniority continues to accumulate while absent." 384 F. Supp. 765, 768 (1974). The record reveals that at least one employee was absent from work for 10 months due to a heart attack and yet returned to her previous job at the end of this period with full seniority dating back to her date of hire.

We have recognized, however, that both intentional discrimination and policies neutral on their face but having a discriminatory effect may run afoul of § 703 (a)(2). *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971). It is beyond dispute that petitioner's policy of depriving employees returning from pregnancy leave of their accumulated seniority acts both to deprive them "of employment opportunities" and to "adversely affect [their] status as an employee." It is apparent from the previous recitation of the events which occurred following respondent's return from pregnancy leave that petitioner's policy denied her specific employment opportunities that she otherwise would have obtained. Even if she had ultimately been able to regain a permanent position with petitioner, she would have felt the effects of a lower seniority level, with its attendant relegation to less desirable and lower paying jobs, for the remainder of her career with petitioner.

In *Gilbert, supra,* there was no showing that General Electric's policy of compensating for all non-job-related disabilities except pregnancy favored men over women. No evidence was produced to suggest that men received more benefits from General Electric's disability insurance fund than did women; both men and women were subject generally to the disabilities covered and presumably drew similar amounts from the insurance fund. We therefore upheld the plan under Title VII.

> "As there is no proof that the package is in fact worth more to men than to women, it is impossible to find any gender-based discriminatory effect in this scheme simply because women disabled as a result of pregnancy do not receive benefits; that is to say, gender-based discrimination does not result simply because an employer's disability-benefits plan is less than all-inclusive. For all that appears, pregnancy-related disabilities constitute an *additional* risk, unique to women, and the failure to compensate them for this risk does not destroy the presumed parity of the benefits, accruing to men and women alike,

which results from the facially evenhanded *inclusion* of risks." 429 U. S., at 138–139 (footnote omitted).

Here, by comparison, petitioner has not merely refused to extend to women a benefit that men cannot and do not receive, but has imposed on women a substantial burden that men need not suffer. The distinction between benefits and burdens is more than one of semantics. We held in *Gilbert* that § 703 (a)(1) did not require that greater economic benefits be paid to one sex or the other "because of their differing roles in 'the scheme of human existence,'" 429 U. S., at 139 n. 17. But that holding does not allow us to read § 703 (a)(2) to permit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.[4]

---

[4] Our conclusion that petitioner's job seniority policies violate Title VII finds support in the regulations of the Equal Employment Opportunity Commission (EEOC). 1972 guidelines of the EEOC specify that "[w]ritten and unwritten employment policies and practices involving . . . the accrual of seniority . . . and reinstatement . . . shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities." 29 CFR § 1604.10 (b) (1976). In *Gilbert,* we rejected another portion of this same guideline because it conflicted with prior, and thus more contemporaneous, interpretations of the EEOC, with interpretations of other federal agencies charged with executing legislation dealing with sex discrimination, and with the applicable legislative history of Title VII. We did not, however, set completely at naught the weight to be given the 1972 guideline. 429 U. S., at 143. Cf. *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 434 (1971).

The portion of the 1972 guideline which prohibits the practice under attack here is fully consistent with past interpretations of Title VII by the EEOC. See, *e. g.,* EEOC, First Annual Report, H. R. Doc. No. 86, 90th Cong., 1st Sess., 40 (1967); EEOC, First Annual Digest of Legal Interpretations, July 1965–July 1966, p. 21 (Opinion Letter GC 218–66 (June 23, 1966)); CCH EEOC Decisions (1973) ¶ 6084 n. 1 (Dec. 16, 1969); CCH EEOC Decisions (1973) ¶ 6184 (Dec. 4, 1970). Nor have we been pointed to any conflicting opinions of other federal agencies responsible for regulating in the field of sex discrimination. This portion of the 1972

Recognition that petitioner's facially neutral seniority system does deprive women of employment opportunities because of their sex does not end the inquiry under § 703 (a) (2) of Title VII. If a company's business necessitates the adoption of particular leave policies, Title VII does not prohibit the company from applying these policies to all leaves of absence, including pregnancy leaves; Title VII is not violated even though the policies may burden female employees. *Griggs, supra,* at 431; *Dothard* v. *Rawlinson,* 433 U. S. 321, 331–332, n. 14 (1977). But we agree with the District Court in this case that since there was no proof of any business necessity adduced with respect to the policies in question, that court was entitled to "assume no justification exists."[5] 384 F. Supp., at 771.

## II

On the basis of the evidence presented to the District Court, petitioner's policy of not awarding sick-leave pay to pregnant employees is legally indistinguishable from the disability-insurance program upheld in *Gilbert.* As in *Gilbert,* petitioner compensates employees for limited periods of time during which the employee must miss work because of a non-job-related illness or disability. As in *Gilbert,* the compensation is not extended to pregnancy-related absences. We emphasized in *Gilbert* that exclusions of this kind are not *per se* violations of Title VII: "[A]n exclusion of pregnancy

---

guideline is therefore entitled to more weight than was the one considered in *Gilbert. Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944).

[5] Indeed, petitioner's policy of denying accumulated seniority to employees returning from pregnancy leave might easily conflict with its own economic and efficiency interests. In particular, as a result of petitioner's policy, inexperienced employees are favored over experienced employees; employees who have spent lengthy periods with petitioner and might be expected to be more loyal to the company are displaced by relatively new employees. Female employees may also be less motivated to perform efficiently in their jobs because of the greater difficulty of advancing through the firm.

from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." 429 U. S., at 136. Only if a plaintiff through the presentation of other evidence can demonstrate that exclusion of pregnancy from the compensated conditions is a mere " 'pretex[t] designed to effect an invidious discrimination against the members of one sex or the other' " does Title VII apply. *Ibid.*

In *Gilbert,* evidence had been introduced indicating that women drew substantially greater sums than did men from General Electric's disability-insurance program, even though it excluded pregnancy. *Id.,* at 130–131, nn. 9 and 10. But our holding did not depend on this evidence. The District Court in *Gilbert* expressly declined to find "that the present actuarial value of the coverage was equal as between men and women." *Id.,* at 131. We upheld the disability program on the ground "that neither [was] there a finding, nor was there any evidence which would support a finding, that the financial benefits of the Plan 'worked to discriminate against any definable group or class in terms of the aggregate risk protection derived by the group or class from the program.' " *Id.,* at 138. When confronted by a facially neutral plan, whose only fault is underinclusiveness, the burden is on the plaintiff to show that the plan discriminates on the basis of sex in violation of Title VII. *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802 (1973).

We again need not decide whether, when confronted by a facially neutral plan, it is necessary to prove intent to establish a prima facie violation of § 703 (a)(1). Cf. *McDonnell Douglas Corp., supra,* at 802–806. *Griggs* held that a violation of § 703 (a)(2) can be established by proof of a discriminatory effect. But it is difficult to perceive how exclusion of pregnancy from a disability insurance plan or sick-leave compensation program "would deprive any individual of employment opportunities" or "otherwise adversely affect his

status as an employee" in violation of § 703 (a)(2). The direct effect of the exclusion is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status. Plaintiff's attack in *Gilbert, supra,* was brought under § 703 (a)(1), which would appear to be the proper section of Title VII under which to analyze questions of sick-leave or disability payments.

Respondent failed to prove even a discriminatory effect with respect to petitioner's sick-leave plan. She candidly concedes in her brief before this Court that "petitioner's Sick Leave benefit plan is, in and of itself, for all intents and purposes, the same as the Weekly Sickness and Accident Insurance Plan examined in *Gilbert*" and that "if the exclusion of sick pay was the only manner in which respondent had been treated differently by petitioner, *Gilbert* would control." Brief for Respondent 10. Respondent, however, contends that because petitioner has violated Title VII by its policy respecting seniority following return from pregnancy leave, the sick-leave pay differentiation must also fall.

But this conclusion by no means follows from the premise. Respondent herself abandoned attacks on other aspects of petitioner's employment policies following rulings adverse to her by the District Court, a position scarcely consistent with her present one. We of course recognized both in *Geduldig* v. *Aiello,* 417 U. S. 484 (1974), and in *Gilbert* that the facial neutrality of an employee benefit plan would not end analysis if it could be shown that " 'distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other . . . .' " *Gilbert,* 429 U. S., at 135. Petitioner's refusal to allow pregnant employees to retain their accumulated seniority may be deemed relevant by the trier of fact in deciding whether petitioner's sick-leave plan was such a pretext. But it most certainly does not require such a finding by a trier of fact, to

say nothing of the making of such a finding as an original matter by this Court.

The District Court sitting as a trier of fact made no such finding in this case, and we are not advised whether it was requested to or not. The decision of the Court of Appeals was not based on any such finding, but instead embodied generally the same line of reasoning as the Court of Appeals for the Fourth Circuit followed in its opinion in *Gilbert* v. *General Electric Co.,* 519 F. 2d 661 (1975). Since we rejected that line of reasoning in our opinion in *Gilbert,* the judgment of the Court of Appeals with respect to petitioner's sick-pay policies must be vacated. That court and the District Court are in a better position than we are to know whether respondent adequately preserved in those courts the right to proceed further in the District Court on the theory which we have just described.[6]

*Affirmed in part, vacated in part, and remanded.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, concurring in the result and concurring in part.

I join Part I of the opinion of the Court affirming the decision of the Court of Appeals that petitioner's policy denying

---

[6] Our Brother POWELL in his concurring opinion suggests that we also remand to allow respondent to develop a theory not articulated to us, *viz.,* that petitioner's sick-leave plan is monetarily worth more to men than to women. He suggests that this expansive remand is required because at the time respondent formulated her case she "had no reason to make the showing of gender-based discrimination required by *Gilbert." Post,* at 148. Respondent's complaint was filed in the District Court on July 1, 1974; a pretrial order was entered by that court setting forth the plaintiff's theory and the defendant's theory on August 28, 1974; and the District Court's memorandum and order for judgment were filed on November 4 and November 20, 1974, respectively. The first of the Court of Appeals cases which our Brother POWELL refers to is *Wetzel* v. *Liberty Mutual Ins. Co.,* 511 F. 2d 199 (CA3), which was decided on February 11, 1975. See

accumulated seniority for job-bidding purposes to female employees returning from pregnancy leave violates Title VII.[1]

I also concur in the result in Part II, for the legal status under Title VII of petitioner's policy of denying accumulated sick-pay benefits to female employees while on pregnancy leave requires further factual development in light of *General Electric Co. v. Gilbert,* 429 U. S. 125 (1976). I write separately, however, because the Court appears to have constricted unnecessarily the scope of inquiry on remand by holding prematurely that respondent has failed to meet her burden of establishing a prima facie case that petitioner's sick-leave policy is discriminatory under Title VII. This case was tried in the District Court and reviewed in the Court of Appeals before our decision in *Gilbert.* The appellate court upheld her claim in accord with the then uniform view of the Courts of Appeals that any disability plan that treated

---

opinion of MR. JUSTICE BRENNAN dissenting in *General Electric Co. v. Gilbert,* 429 U. S., at 146. Not only at the time that respondent filed a complaint, but at the time the District Court rendered its decision, *Geduldig v. Aiello,* 417 U. S. 484 (1974), had been very recently decided, and the most that can be said on respondent's behalf is that the question of whether the analysis of that case would be carried over to cognate sections of Title VII was an open one. Our opinion in *Gilbert* on this and other issues, of course, speaks for itself; we do not think it can rightly be characterized as so drastic a change in the law as it was understood to exist in 1974 as to enable respondent to raise or reopen issues on remand that she would not under settled principles be otherwise able to do. We assume that the Court of Appeals and the District Court will apply these latter principles in deciding what claims may be open to respondent on remand.

[1] I would add, however, that petitioner's seniority policy, on its face, does not "appea[r] to be neutral in its treatment of male and female employees." *Ante,* at 140. As the District Court noted below, "only pregnant women are required to take leave and thereby lose job bidding seniority and no leave is required in other non-work related disabilities . . . ." 384 F. Supp. 765, 771 (MD Tenn. 1974). This mandatory maternity leave is not "identical to the formal leave of absence granted to employees, male or female, in order that they may pursue additional education." *Ante,* at 140 n. 2.

pregnancy differently from other disabilities was *per se* violative of Title VII.[2] Since respondent had no reason to make the showing of gender-based discrimination required by *Gilbert,* I would follow our usual practice of vacating the judgment below and remanding to permit the lower court to reconsider its sick-leave ruling in light of our intervening decision.

The issue is not simply one of burden of proof, which properly rests with the Title VII plaintiff, *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425 (1975); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802 (1973), but of a "full opportunity for presentation of the relevant facts," *Harris* v. *Nelson,* 394 U. S. 286, 298 (1969). Given the meandering course that Title VII adjudication has taken, final resolution of a lawsuit in this Court often has not been possible because the parties or the lower courts proceeded on what was ultimately an erroneous theory of the case. Where the mistaken theory is premised on the pre-existing understanding of the law, and where the record as constituted does not foreclose the arguments made necessary by our ruling, I would prefer to remand the controversy and permit the lower courts to pass on the new contentions in light of whatever additional evidence is deemed necessary.

For example, in *Albemarle Paper Co.* v. *Moody, supra,* the Court approved the Court of Appeals' conclusion that the employer had not proved the job relatedness of its testing program, but declined to permit immediate issuance of an

---

[2] See cases cited in *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 147 (1976) (BRENNAN, J., dissenting).

*Gilbert* held that the rationale articulated in *Geduldig* v. *Aiello,* 417 U. S. 484 (1974), involving a challenge on equal protection grounds, also applied to a Title VII claim with respect to the treatment of pregnancy in benefit plans. See 429 U. S., at 133–136. Since *Geduldig* itself was silent on the Title VII issue, the Courts of Appeals not unreasonably failed to anticipate the extent to which the *Geduldig* rationale would be deemed applicable in the statutory context. See *Washington* v. *Davis,* 426 U. S. 229, 246–248 (1976).

injunction against all use of testing in the plant. The Court thought that a remand to the District Court was indicated in part because "[t]he appropriate standard of proof for job relatedness has not been clarified until today," and the plaintiffs "have not until today been specifically apprised of their opportunity to present evidence that even validated tests might be a 'pretext' for discrimination in light of alternative selection procedures available to the Company." 422 U. S., at 436.

Similarly, in *Teamsters* v. *United States,* 431 U. S. 324 (1977), we found a remand for further factual development appropriate because the Government had employed an erroneous evidentiary approach that precluded satisfaction of its burden of identifying which nonapplicant employees were victims of the employer's unlawful discrimination and thus entitled to a retroactive seniority award. "While it may be true that many of the nonapplicant employees desired and would have applied for line-driver jobs but for their knowledge of the company's policy of discrimination, the Government must carry its burden of proof, with respect to each specific individual, at the remedial hearings to be conducted by the District Court on remand." *Id.,* at 371.[3] Cf. *Brown* v. *Illinois,* 422 U. S. 590, 613–616 (1975) (POWELL, J., concurring in part).

Here, respondent has abandoned the theory that enabled her to prevail in the District Court and the Court of Appeals. Instead, she urges that her case is distinguishable from *Gilbert:*

"Respondent submits that because the exclusion of sick pay is only one of the many ways in which female

---

[3] The Court also declined to "evaluate abstract claims concerning the equitable balance that should be struck between the statutory rights of victims and the contractual rights of nonvictim employees," preferring to lodge this task, in the first instance, with the trial court which would be best able to deal with the problem in light of the facts developed at the hearings on remand. 431 U. S., at 376.

employees who experience pregnancy are treated differently by petitioner, the holding in *Gilbert* is not controlling. Upon examination of the overall manner in which female employees who experience pregnancy are treated by petitioner, it becomes plain that petitioner's policies are much more pervasive than the mere under-inclusiveness of the Sickness and Accident Insurance Plan in *Gilbert*." Brief for Respondent 10.

At least two distinguishing characteristics are identified by respondent. First, as found by the District Court, only pregnant women are required to take a leave of absence and are denied sick-leave benefits while in all other cases of nonoccupational disability sick-leave benefits are available. 384 F. Supp. 765, 767, 771 (MD Tenn. 1974). Second, the sick-leave policy is necessarily related to petitioner's discriminatory denial of job-bidding seniority to pregnant women on mandatory maternity leave, presumably because both policies flow from the premise that a female employee is no longer in active service when she becomes pregnant.

Although respondent's theory is not fully articulated, she presents a plausible contention, one not required to have been raised until *Gilbert* and not foreclosed by the stipulated evidence of record, see *Gilbert,* 429 U. S., at 130–131, n. 9, and 131 n. 10, or the concurrent findings of the lower courts, see *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 270 (1977). It is not inconceivable that on remand respondent will be able to show that the combined operation of petitioner's mandatory maternity-leave policy[4]

---

[4] The majority places some reliance on respondent's failure to appeal from the part of the District Court's ruling which found petitioner's mandatory leave policy to be lawful under Title VII. *Ante,* at 138 n. 1, and 145. For the reasons stated in the text, however, petitioner's maintenance of a mandatory maternity-leave policy, even if entirely lawful, may have a bearing on the question whether the sick-pay policy "is in fact worth more to men than to women," *Gilbert,* 429 U. S., at 138.

and denial of accumulated sick-pay benefits yielded significantly less net compensation for petitioner's female employees than for the class of male employees. A number of the former, but not the latter, endured forced absence from work without sick pay or other compensation. The parties stipulated that between July 2, 1965, and August 27, 1974, petitioner had placed 12 employees on pregnancy leave, and that some of these employees were on leave for periods of two months or more. App. 33. It is possible that these women had not exhausted their sick-pay benefits at the time they were compelled to take maternity leave, and that the denial of sick pay for this period of absence resulted in a relative loss of net compensation for petitioner's female work force. Petitioner's male employees, on the other hand, are not subject to a mandatory leave policy, and are eligible to receive compensation in some form for any period of absence from work due to sickness or disability.

In short, I would not foreclose the possibility that the facts as developed on remand will support a finding that "the package is in fact worth more to men than to women." *Gilbert, supra,* at 138. If such a finding were made, I would view respondent's case as not barred by *Gilbert.*[5] In that case, the Court related: "The District Court noted the evidence introduced during the trial, a good deal of it stipulated, concerning the relative cost to General Electric of providing benefits under the Plan to male and female employees, all of which indicated that, with pregnancy-related disabilities excluded, the cost of the Plan to General Electric per female employee was at least as high as, if not substantially higher than, the cost per male employee." 429 U. S., at 130 (footnotes omitted). The District Court also "found that the inclusion of pregnancy-related disabilities within the scope of the Plan would 'increase G. E.'s [disability-benefits plan] costs

---

[5] Also, if the theory left open by the Court's remand is demonstrated, *Gilbert* will present no bar.

by an amount which, though large, is at this time undeterminable.' 375 F. Supp., at 378." *Id.*, at 131. While the District Court declined to make an explicit finding that the actuarial value of the coverage was equal between men and women, it may have been referring simply to the quantum and specificity of proof necessary to establish a "business necessity" defense. See *Gilbert* v. *General Electric Co.*, 375 F. Supp. 367, 382–383 (ED Va. 1974). In any event, in *Gilbert* this Court viewed the evidence of record as precluding a prima facie showing of discrimination in "compensation" contrary to § 703 (a)(1). "Whatever the ultimate probative value of the evidence introduced before the District Court on this subject . . . , at the very least it tended to illustrate that the selection of risks covered by the Plan did not operate, in fact, to discriminate against women." 429 U. S., at 137–138. As the record had developed in *Gilbert*, there was no basis for a remand.

I do not view the record in this case as precluding a finding of discrimination in compensation within the principles enunciated in *Gilbert*.[6] I would simply remand the sick-pay

---

[6] The Court's opinion at one point appears to read *Gilbert* as holding that a Title VII plaintiff in a § 703 (a)(1) case must demonstrate that "exclusion of pregnancy from the compensated conditions is a mere 'pretex[t].' " *Ante*, at 144. Later in its opinion, the Court states that we need not decide "whether, when confronted by a facially neutral plan, it is necessary to prove intent to establish a prima facie violation of § 703 (a)(1)." *Ibid.* As noted in n. 1, *supra*, I cannot assume that petitioner's seniority policy in this case is facially neutral. Moreover, although there may be some ambiguity in the language in *Gilbert*, see concurring opinions of MR. JUSTICE STEWART and MR. JUSTICE BLACKMUN, 429 U. S., at 146, I viewed our decision in that case as grounded primarily on the emphasized fact that no discrimination in compensation as required by § 703 (a)(1) had been shown. Indeed, a fair reading of the evidence in *Gilbert* demonstrated that the total compensation of women in terms of disability-benefit plans well may have exceeded that of men. I do not suggest that mathematical exactitude can or need be shown in every § 703 (a)(1) case. But essential equality in *compensation* for comparable work

issue for further proceedings in light of our decision in that case.

Mr. Justice Stevens, concurring in the judgment.

Petitioner enforces two policies that treat pregnant employees less favorably than other employees who incur a temporary disability. First, they are denied seniority benefits during their absence from work and thereafter; second, they are denied sick pay during their absence. The Court holds that the former policy is unlawful whereas the latter is lawful. I concur in the Court's judgment, but because I believe that its explanation of the legal distinction between the two policies may engender some confusion among those who must make compliance decisions on a day-to-day basis, I advance a separate, and rather pragmatic, basis for reconciling the two parts of the decision with each other and with *General Electric Co.* v. *Gilbert,* 429 U. S. 125.

The general problem is to decide when a company policy which attaches a special burden to the risk of absenteeism caused by pregnancy is a prima facie violation of the statutory prohibition against sex discrimination. The answer "always," which I had thought quite plainly correct,[1] is foreclosed by the Court's holding in *Gilbert.* The answer "never" would seem

---

is at the heart of § 703 (a) (1). In my view, proof of discrimination in this respect would establish a prima facie violation.

[1] "An analysis of the effect of a company's rules relating to absenteeism would be appropriate if those rules referred only to neutral criteria, such as whether an absence was voluntary or involuntary, or perhaps particularly costly. This case, however, does not involve rules of that kind.

"Rather, the rule at issue places the risk of absence caused by pregnancy in a class by itself. By definition, such a rule discriminates on account of sex; for it is the capacity to become pregnant which primarily differentiates the female from the male. The analysis is the same whether the rule relates to hiring, promotion, the acceptability of an excuse for absence, or · an exclusion from a disability insurance plan." *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 161–162 (Stevens, J., dissenting).

154

to be dictated by the Court's view that a discrimination against pregnancy is "not a gender-based discrimination at all." [2]   The Court has, however, made it clear that the correct answer is "sometimes."   Even though a plan which frankly and unambiguously discriminates against pregnancy is "facially neutral," the Court will find it unlawful if it has a "discriminatory effect." [3]   The question, then, is how to identify this discriminatory effect.

Two possible answers are suggested by the Court.   The Court seems to rely on (a) the difference between a benefit and a burden, and (b) the difference between § 703 (a)(2) and § 703 (a)(1).   In my judgment, both of these differences are illusory.[4]   I agree with the Court that the effect of the respond-

[2] In *Gilbert, supra,* at 136, the Court held that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all."   Consistently with that holding, the Court today states that a "decision not to treat pregnancy as a disease or disability for purposes of seniority retention is not on its face a discriminatory policy."   *Ante,* at 140.

[3] *Ante,* at 141;   429 U. S., at 146 (STEWART, J., concurring);   *ibid.* (BLACKMUN, J., concurring in part).

[4] Differences between benefits and burdens cannot provide a meaningful test of discrimination since, by hypothesis, the favored class is always benefited and the disfavored class is equally burdened.   The grant of seniority is a benefit which is not shared by the burdened class; conversely, the denial of sick pay is a burden which the benefited class need not bear.

The Court's second apparent ground of distinction is equally unsatisfactory.   The Court suggests that its analysis of the seniority plan is different because that plan was attacked under § 703 (a)(2) of Title VII, not § 703 (a)(1).   Again, I must confess that I do not understand the relevance of this distinction.   It is true that § 703 (a)(1) refers to "discrimination" and § 703 (a)(2) does not.   But the Court itself recognizes that this is not significant since a violation of § 703 (a)(2) occurs when a facially neutral policy has a *"discriminatory effect." Ante,* at 141 (emphasis added).   The Court also suggests that § 703 (a)(1) may contain a requirement of intent not present in § 703 (a)(2).   Whatever the merits of that suggestion, it is apparent that it does not form the basis for any differentiation between the two subparagraphs of § 703 in this case, since the Court expressly refuses to decide the issue.   *Ante,* at 144.

ent's seniority plan is significantly different from that of the General Electric disability plan in *Gilbert*, but I suggest that the difference may be described in this way: Although the *Gilbert* Court was unwilling to hold that discrimination against pregnancy—as compared with other physical disabilities—is discrimination on account of sex, it may nevertheless be true that discrimination against pregnant or formerly pregnant employees—as compared with other employees—does constitute sex discrimination. This distinction may be pragmatically expressed in terms of whether the employer has a policy which adversely affects a woman beyond the term of her pregnancy leave.

Although the opinion in *Gilbert* characterizes as "facially neutral" a company policy which differentiates between an absence caused by pregnancy and an absence caused by illness, the factual context of *Gilbert* limits the reach of that broad characterization. Under the Court's reasoning, the disability plan in *Gilbert* did not discriminate against pregnant employees or formerly pregnant employees while they were working for the company. If an employee, whether pregnant or non-pregnant, contracted the measles, he or she would receive disability benefits; moreover, an employee returning from maternity leave would also receive those benefits. On the other hand, pregnancy, or an illness occurring while absent on maternity leave, was not covered.[5] During that period of maternity leave, the pregnant woman was temporarily cut off from the benefits extended by the company's plan. At all other times, the woman was treated the same as other employees in terms of her eligibility for the plan's benefits.

---

[5] See *Gilbert*, 429 U. S., at 129 n. 4. Although I have the greatest difficulty with the Court's holding in *Gilbert* that it was permissible to refuse coverage for an illness contracted during maternity leave, I suppose this aspect of *Gilbert* may be explained by the notion that any illness occurring at that time is treated as though it were attributable to pregnancy, and therefore is embraced within the area of permissible discrimination against pregnancy.

The Company's seniority plan in this case has a markedly different effect. In attempting to return to work, the formerly pregnant woman is deprived of all previously accumulated seniority. The policy affects both her ability to re-enter the work force, and her compensation when she does return.[6] The Company argues that these effects are permissible because they flow from its initial decision to treat pregnancy as an unexcused absence. But this argument misconceives the scope of the protection afforded by *Gilbert* to such initial decisions. For the General Electric plan did not attach any consequences to the condition of pregnancy that extended beyond the period of maternity leave. *Gilbert* allowed the employer to treat pregnancy leave as a temporal gap in the full employment status of a woman. During that period, the employer may treat the employee in a manner consistent with the determination that pregnancy is not an illness.[7] In this case, however, the Company's seniority policy has an adverse impact on the employee's status after pregnancy leave is terminated. The formerly pregnant person is permanently disadvantaged as compared to the rest of the work force. And since the persons adversely affected by this policy constitute an exclusively female class, the Company's plan has an obvious discriminatory effect.[8]

---

[6] *Ante*, at 138–139.

[7] These two limitations—that the effect of the employer's policy be limited to the period of the pregnancy leave and that it be consistent with the determination that pregnancy is not an illness—serve to focus the disparate effect of the policy on pregnancy rather than on pregnant or formerly pregnant employees. Obviously, policies which attach a burden to pregnancy also burden pregnant or formerly pregnant persons. This consequence is allowed by *Gilbert*, but only to the extent that the focus of the policy is, as indicated above, on the physical condition rather than the person.

[8] This analysis is consistent with the approach taken by lower courts to post-*Gilbert* claims of pregnancy-based discrimination, which have recognized that *Gilbert* has "nothing to do with foreclosing employment opportunity." *Cook* v. *Arentzen*, 14 EPD ¶ 7544, p. 4702 (CA4 1977);

Under this analysis, it is clear that petitioner's seniority rule discriminating against formerly pregnant employees is invalid. It is equally clear that the denial of sick pay during maternity leave is consistent with the *Gilbert* rationale, since the Company was free to withhold those benefits during that period.[9]

As is evident from my dissent in *Gilbert*, I would prefer to decide this case on a simpler rationale. Since that preference is foreclosed by *Gilbert*, I concur in the Court's judgment on the understanding that as the law now stands, although some discrimination against pregnancy—as compared with other physical disabilities—is permissible, discrimination against pregnant or formerly pregnant employees is not.

---

*MacLennan* v. *American Airlines, Inc.*, 440 F. Supp. 466 (Va. 1977) (addressing the question of when, if ever, an employer can require an employee to take pregnancy leave). This case does not pose the issue of when an employer may require an employee to take pregnancy leave. *Ante*, at 138 n. 1.

[9] In his concurring opinion, MR. JUSTICE POWELL seems to suggest that, even when the employer's disparate treatment of a pregnant employee is limited to the period of the pregnancy leave, it may still violate Title VII if the company's rule has a greater impact on one sex than another. *Ante*, at 151–152. If this analysis does not require an overruling of *Gilbert* it must be applied with great caution, since the laws of probability would invalidate an inordinate number of rules on such a theory. It is not clear to me what showing, beyond "mathematical exactitude," see *ante*, at 152 n. 6, is necessary before this Court will hold that a classification, which is by definition gender specific, discriminates on the basis of sex. Usually, statistical disparities aid a court in determining whether an apparently neutral classification is, in effect, gender or race specific. Here, of course, statistics would be unnecessary to prove that point. In all events, I agree with the Court that this issue is not presented to us in this case, and accordingly concur in the Court's determination of the proper scope of the remand.