**NATIONAL BROADCASTING COMPANY, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS, Respondent.**

**Phyllis J. Law and Gwendolyn J. Lewis, Intervenors.**

**No. 82–504.**

District of Columbia Court of Appeals.

Argued Jan. 18, 1983.

Decided June 20, 1983.

John T. Rose II, New York City, with whom John F. Sturm, Washington, D.C., and Elaine C. Buck, New York City, were on briefs for petitioner.

Lutz Alexander Prager, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.

Lawrence S. Lapidus, Washington, D.C., with whom Lawrence J. Sherman, Washington, D.C., was on brief, for intervenors.

Before TERRY, Associate Judge, REILLY, Chief Judge, Retired, and KELLY,* Associate Judge, Retired.

REILLY, Chief Judge, Retired:

This is the second time this court has been called upon to decide whether or not the exclusion of pregnancy related disabili-

---

* Judge Kelly was an Associate Judge at the time of argument. Her status changed to Associate Judge, Retired, on March 31, 1983.

ties from a company paid sick leave and benefit plan constitutes a violation of the District of Columbia Human Rights Law.[1] On the previous occasion, we answered that question in the negative, *Group Hospitalization, Inc. v. District of Columbia Comm. on Human Rights,* 380 A.2d 170 (D.C.1977), citing as controlling *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), and *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). In the latter case, the Supreme Court decided that exclusion of pregnancy from a company sickness and accident insurance program did not violate the prohibitions against discrimination on the basis of sex contained in Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2 (1970). Noting that the wording of the local act was similar to the statutory provision construed by the Supreme Court, we were then constrained to vacate an order of the D.C. Commission based on a contrary premise, holding "... that the broad reasoning of *Geduldig* and *Gilbert* also applies to such claims brought under the former Article 47 and the present Human Rights Law". *Group Hospitalization, Inc. v. District of Columbia Comm. on Human Rights, supra,* 380 A.2d at 173–74.

In its memorandum opinions, accompanying the order now challenged in a petition for review, the Commission refused to follow *Group Hospitalization* on the ground that Title 34, the 1973 enactment,[2] replacing Article 47 was so much broader than either that article or the corresponding title of the Civil Rights Act construed in the *Gilbert* case, that the agency's authority to redress complaints of sex discrimination based on the denial of pregnancy related disability benefits was not limited by those judicial holdings.

While we agree that the 1973 revision was indeed broader in many respects than either the preceding act or the Civil Rights law—it added to the categories protected against discrimination—we are unable to discern any provisions in it which would be grounds for distinguishing the case before us from *Group Hospitalization.* Certainly none were expressly directed at the principal issue in that case or this. Accordingly, as the doctrine of *stare decisis* has prevailed anciently in this jurisdiction, we must set aside the order of the Commission.

The record of the Commission proceedings—the basis of the order now under review—shows that, in 1976, the petitioner here, National Broadcasting Company (NBC), entered into a four year collective bargaining contract with the National Association of Broadcasting Engineers and Technicians, AFL–CIO (referred to herein as "the union"). At that time, the Supreme Court had already decided *Geduldig, supra,* and *Gilbert, supra,* was pending before it. The union contract provided paid sick leave for a twelve week period and incorporated by reference an insurance plan according disability allowances for a limited period for non-occupational injuries and sickness. An explicit exception to the right of paid sick leave was a section of the contract reading:

> The Company shall, upon written application from a female regular employee, grant special leave of absence not exceeding six (6) months, without pay, for maternity reasons with full reinstatement privileges. Such employee's seniority for all purposes upon returning shall include the period of such leave of absence.

Section 13.2.

The insurance plan also contained a clause exempting from its benefits persons unable to work by "disability caused by or

---

1. 34 DCRR § 11.1. This statute, enacted by the City Council on November 17, 1973, was superseded by Human Rights Act, D.C.Law 2–38, in 1977, codified as D.C.Code § 1–2501 *et seq.,* which made no change in the substantive provisions of the 1973 act, under which the instant case arose.

2. This enactment (*see supra* note 1) under which the instant case arose was the very one referred to in *Group Hospitalization* as "the present Human Rights Law."

resulting from pregnancy, childbirth, miscarriage or abortion."

In December of 1976, several months after the union contract had become effective, two employees in the bargaining unit[3] gave birth to children. One of them, Phyllis J. Law, at the time of delivery, was on paid sick leave because of an automobile injury. The company then placed her on unpaid maternity leave until she reported to the office on March 1, 1977, with a physician's certificate attesting she was able to resume work, at which time she was reinstated to the payroll without loss of seniority. The other woman, Gwendolyn J. Lewis, took maternity leave on November 19, 1976, on the advice of her physician and had her child about three weeks afterwards. She did obtain a statement later from her obstetrician to the effect that she was physically able to return to work on February 14, 1977, but elected not to resume employment. Neither employee ever filed written claims for paid sick leave or other benefits with the company, but did, however, file complaints with the Commission sometime in February of 1977.[4]

While the Commission was investigating the complaints prior to assigning the matter to a hearing commissioner, the *Group Hospitalization* opinion was published. Drawing this decision to the attention of the Commission, the company moved to dismiss the complaints. The Commission denied this motion. It explained its ruling in a short memorandum stating:

In a motion to dismiss filed on August 1, 1978, NBC—relying on a two-sentence quotation from *Group Hospitalization,*

*Inc. v. District of Columbia,* 16 FEP (D.C. Cir.1977)—argues that this Commission has no jurisdiction to consider these complaints. In their opposition, Complainants argue that the GHI case is not determinative because the case involved a sex discrimination complaint arising under Article 43 S4(a) which was repealed on November 17, 1973 when Title 34 was enacted. The Commission agrees with Complainants that the holding in the *GHI* case has no bearing on the Commission's authority under Title 34 to consider complaints of discrimination against employers who exclude pregnancy and pregnancy-related disabilities from employees' benefits plans covering other non-occupational medical conditions. NBC has failed to persuade the Commission that we should change our legal opinion (1) that the legislative history and plain wording demonstrate that Title 34 is broader in jurisdictional scope than Title VII of the Civil Rights Act of 1964 because, unlike the latter, our local law includes martial [sic] status, pregnancy and parenthood in the definition of sex discrimination, and (2) that, therefore, the Supreme Court decisions in *Geduldig v. Aiello,* 417 U.S. 484 [94 S.Ct. 2485, 41 L.Ed.2d 256] (1974) and *General Electric Co. v. Gilbert,* 429 U.S. 125 [97 S.Ct. 401, 50 L.Ed.2d 343] (1976) do not limit our authority to consider complaints of sex discrimination based on the denial of pregnancy related disability benefits.

Aside from the error in citation,[5] the foregoing rationale is marred by one con-

---

3. The record shows that both women were also members of the union.

4. Petitioner argues that the failure of the claimants to invoke the procedures provided under the NABET contract deprived the Commission of jurisdiction to adjudicate their claims. While we recognize that the principle of exhaustion of remedies applies to actions brought by employees asserting rights under collective bargaining contracts containing grievance or arbitration clauses, this rule has no bearing on this case. The union was plainly estopped from arguing that the claimants were aggrieved

by the precise application of a clause (maternity leave) for which it had bargained *inter alia;* and the presentation of a written complaint to the insurance carrier for failure to make disability payments would have been a futile gesture in view of the exemption provisions in the policy.

5. Had the Commission not confined itself to the reading of "only a two-sentence quotation from *Group Hospitalization,*" it might have discovered that the decision was handed down not by the United States Court of Appeals for this circuit, but by the court vested with authority

spicuous inaccuracy—the Commission's assertion that the act it administers "includes marital status, pregnancy and parenthood in the *definition of sex discrimination.*" (emphasis supplied.) The statute contains no definition of either the term "sex discrimination" or the word "sex."˙ Where "parenthood and pregnancy" ·arē mentioned in the statute is· in the definition of the term "marital status," a category unrelated to sex discrimination.

### Marital Status

More than a year later—the case having eventually gone to hearing before an examiner—the Commission issued a final decision and order sustaining the complaints and awarding damages. This time at least, the Commission did correct its erroneous description of the statutory definition upon which it relied. In explaining the grounds for its action, the agency stated:

> The denial of these benefits constitutes a violation of Title 34, Section 211(1), Human Rights Law, now the Human Rights Act of 1977, because Mrs. Law and Mrs. Lewis were denied benefits *solely* because they are married women who gave birth to children. There is no evidence that men who are temporarily disabled are treated similarly. In Mrs. Lewis' case, Respondent assessed an additional penalty of loss of vacation pay because she elected to remain home in 1977 to care for her newborn child.

> The Human Rights Law, by its broad language, was designed to protect working women from discrimination in employment by virtue of not only their sex, but their status as parents. "Marital Status," a prohibited basis of employment discrimination under the Human Rights Law, means, "the state of being married, single, divorced, separated or widowed

and the usual conditions associated therewith, *including pregnancy or parenthood.*" (emphasis in original.)

It seems[6] from the foregoing that the Commission though tacitly recognizing that it was precluded by judicial decisions from granting relief on the basis of sex discrimination regarded the inclusion of the words "pregnancy and parenthood" in the definition of "marital status" (§ 34–101(q)) as sufficient grounds for deeming NBC guilty of unlawful discrimination. But in its brief, petitioner contends:

> By including the term pregnancy here rather than in section 211, where the various bases of unlawful discrimination are listed, it is clear that the Council never intended to prohibit discrimination based upon pregnancy alone. It is equally clear, since pregnancy is not now, nor has it ever been a "usual condition(s) associated" with only the state of being married, classifications involving pregnancy can never be actionable unless the complainant demonstrates that she was discriminated against because she was both pregnant and married. Both the Commission and the intervenors concede this.

■ In our opinion, petitioner's point is well taken. When the Council set out in 1973 to revise the local Human Rights ordinance, it knew that Title VII of the Civil Rights Act (42 U.S.C. § 2000e–2(a)(1)) and its local counterpart, prohibiting discrimination because of race, color, religion, sex or national origin, did not encompass all forms of discrimination. Aware that there were certain classes of persons whose characteristics placed them at a disadvantage in some segments of the labor market, e.g., persons with physical handicaps, unprepossessing appearance, homosexual proclivities, or burdensome domestic obligations, the Council

to review orders of such administrative agencies as the Commission. D.C.Code §§ 1–1510, –2554 (1981).

**6.** We say "seems" because in another sentence in the concluding paragraph, the Commission muddied the water by stating:

> Discrimination against both women ... was based solely on reasons of their female sex, pregnancy, and parentage [sic].

decided to add persons thus afflicted as well as others to the list of categories protected against employer disfavor (*see* § 34–211, *supra,* now codified as D.C.Code § 1–2501 (1981)). It was also common knowledge that in occupations calling for long hours of work, extensive travel, or exposure to hazards, employers have long been inclined to prefer single persons to those involved with the possibly conflicting allegiances of married life.[7] The sex discrimination provisions of the Civil Rights Act did not outlaw such practices.[8] Nor did they inhibit lay-off policies favoring the retention of married persons with dependents when employers are faced with the painful task of making reductions in force. Apparently regarding such practices or policies as inherently discriminatory, the Council decided to add marital status to the expanded list of factors which should be immune from employer scrutiny.

Had the Council in defining "marital status" restricted the term to meaning "the state of being married and the usual conditions associated therewith including pregnancy and parenthood," there would have been some support for the Commission's rationale. Under such wording, it could be inferred that the legislative purpose was directed against employer policies which disfavored either married persons, or married persons with, or about to have, children. This hypothesis could account for the conclusion that the claimants in this case were "denied benefits solely because they are married women who gave birth to children."[9]

Significantly, however, the Council did not adopt so narrow a definition of "marital status" for it included the words "single, divorced, separated, or widowed" in juxtaposition with the word "married." Thus it forbade employers from treating marriage or lack of marriage as a lawful factor to be considered in hire, tenure, or conditions of employment. By the same token, so far as pregnancy and parenthood were concerned, it prohibited disparate treatment of married and unmarried mothers by strait-laced employers. The government concedes as much, stating in its brief:

> Under the Commission's reading, it would be unlawful to discriminate against single, separated, divorced, or widowed men or women because they are parents or (in the case of women) pregnant even though it might be arguable that parenthood and pregnancy are not a "usual condition" with each marital state.

If this is indeed the thrust of the "Commission's reading" the agency plainly overlooked the fact that with respect to the NBC plan, there is no evidence whatsoever of discrimination on the basis of marital status. Neither the text of the maternity leave provisions nor the exemption clause in the disability plan draws any distinction between married and unmarried child-bearing women. Why the Commission inferred the claimants would have been treated differently had they not been married is something of a mystery. Hence, the Commission's reliance on the addition of the term "marital status" in the 1973 Human Rights Act cannot be sustained.

---

7. "He that hath wife and children has given hostages to fortune; they are impediments to great enterprise either of virtue or of mischief." Francis Bacon, *Essay on Marriage and Single Life.*

8. In *Cooper v. Delta Air Lines, Inc.,* 274 F.Supp. 781, 783 (E.D.La.1967), *appeal dismissed,* No. 25–698 (5th Cir.1968), an air line stewardess whose employment was terminated upon her marriage, was told by the court: "The discrimination lies in the fact that the plaintiff was married—and the law does not prevent discrimination against married people in favor of the single ones." *Id.*

9. Somewhat ironically in view of the Commission's emphasis on the married status of the complainants, there is no evidence in the record to sustain this factual finding. As NBC argued (and the government agrees), the agency simply assumed both women were married. The government suggests that this factual gap in the record can be corrected by a remand. We think this course of action unnecessary for neither the statute (if correctly interpreted) nor the NBC plan makes a distinction between pregnancies of the married and unmarried.

*Family Responsibilities*

In a lengthy brief defending the Commission's action the government points to an alternative ground for justifying the order under review. Drawing our attention to another provision which found its way into the 1973 enactment, the government argues that the order should be enforced because the NBC–NABET plan amounted to discrimination against persons with "family responsibilities"—a prohibited practice under the Act. As the Commission itself did not rely upon or even mention this particular statutory provision in its opinion, to sustain the Commission's actions upon this ground would ignore the well established principle that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). But, even if this contention were properly before us, it would have to be rejected, because it depends upon a construction of the Act at odds with the wording and legislative intent.

Prior to the 1973 enactment, one of the cases arising under the Civil Rights Act which was given national publicity was an action asserting that the company policies discouraging the hiring of mothers of pre-school age children (unless there was an adult in the home to take care of them during working hours) amounted to sexual discrimination. This claim was upheld by the Supreme Court, but on the narrow ground that such practices were discriminatory only upon a showing that the same policy was not applied to male applicants for employment. *Phillips v. Martin Mariet-*

*ta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971).

Undoubtedly, the sponsors of the 1973 version, being familiar with this litigation, decided to broaden the new act to protect from loss of employment or credit opportunities, parents of either sex as well as other persons saddled with heavy financial obligations to dependents.[10] Accordingly, they added to the new categories persons with "family responsibilities" and defined the term to mean, "the state of being, or the potential to become, a contributor to the support of a person, or persons in a dependent relationship, irrespective of their number." 34 DCRR § 3.1.

In contending that the NBC plan discriminated against persons thus defined, the government does not contend that a child *en ventre sa mere* is a "person in a dependent relationship." Instead, it seizes upon the word "potential." It ignores the fact that once actual dependency occurs, a mother is free under the maternity leave clause to resume employment whenever her health permits, irrespective of whether or not she is the sole contributor to the child's support, and also irrespective of how many dependents she might already be supporting. It would be a strange paradox to condemn as discriminatory a practice which might hurt persons with a "potential" for family responsibilities, but harms not in the slightest persons whose family responsibilities have indeed materialized.[11]

*Sex Discrimination*

Although the 1973 revision of the earlier Human Rights ordinance made no change in the provision forbidding discrimi-

---

10. Many personnel offices are reluctant to hire workers with numerous dependents because they fear that financial stresses, harassment by creditors including resort to garnishee process, or abnormal absenteeism, will impair efficient job performance.

11. To give the word "potential" the breadth ascribed to it in the government's brief, would mean that virtually all employees have "family responsibilities," for by adoption or procreation—to say nothing of contingent duties owed

disabled parents, brothers or sisters—the "potential" for becoming "a contributor to the support of a person" applies almost without exception to every member of a work force. Indeed, it was not until *In re Bassett's Estate,* 104 N.H. 504, 190 A.2d 415 (1963), that courts in this country abandoned the common law presumption that even the most elderly women were potential mothers. *Jee v. Audley,* 1 Cox 324 (Cr.1787).

nation on the basis of sex, some language in the agency opinions indicates that the Commission is still of the view that the exclusion of pregnancy related disabilities from a fringe benefit plan is a violation *per se* of this prohibition.[12] We had thought that this issue had been laid to rest by *Group Hospitalization, supra,* and by the judicial authorities cited therein. Notwithstanding, the government has attempted to breathe new life into this controversy by arguing at some length that on this ground alone the order of the Commission was justified. It contends that the language and legislative history of Title 34, and subsequent judicial and legislative developments, both federal and state, "show the decision [*Group Hospitalization*] to be both isolated and ill considered."

The reasons given in support of this sweeping statement may be disposed of briefly. Citing with approval numerous decisions of state courts to the effect that since "pregnancy is unique to women" the exclusion of medical conditions incident thereto from disability programs is *ipso facto* a distinction based on sex, we are urged to follow this "near unanimity of state authority." This is the same threadbare argument rejected by the Supreme Court in the *Gilbert* and *Geduldig* cases. Whether we as judges agree or disagree personally with such holdings is scarcely material. This court was created not by state law but by congressional legislation authorized by article I of the United States Constitution.[13] Hence, it is plainly not the province of any court established under either article I or article III to disregard the pronouncements of the highest court established by that instrument.

Equally specious is the assertion that the authority of *Gilbert* was undermined by the Supreme Court in two later decisions, *Nashville Gas Co. v. Satty,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) and *City of Los Angeles v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). The latter case had nothing to do with a pregnancy issue.[14] In *Satty,* the majority of the Court was at pains to reemphasize its reasoning in *Gilbert,* but distinguished it from the case before it—a challenge to the practice of docking the seniority of women who returned to work after a childbirth absence. Obviously, *Satty* has no bearing upon the instant case, as the NBC plan preserved full seniority for women resuming employment after maternity leave.

The legislative development to which the government brief refers occurred in 1978 when Congress amended the Civil Rights Act by inserting "pregnancy, childbirth, or related medical conditions" as included factors in a new definition of "because of sex."[15] It is true that the sponsors of the bill expressed disagreement with the majority opinion in *Gilbert.* But why the government deems legislation in 1978 as having any relevance to events occurring two years before is difficult to understand.[16] Congress itself recognized that until it acted, the *Gilbert* holding was the law of the land and accordingly postponed the effective date of its amendment for 180 days to provide a "transition" period for readjustment

---

12. See quoted excerpt from memorandum denying motion to dismiss, *supra,* and note 6 *supra.*

13. *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). *Cf. art.* I, § 8, cl. 9, empowering Congress "to constitute tribunals *inferior* to the Supreme Court."

14. In *Manhart,* the employer's practice deemed to fall within the ban on sexual discrimination was the imposition upon female employees of higher contributions to a pension plan. Only

one concurring justice thought that this holding cut back on *Gilbert*—a comment enthusiastically embraced by the government's brief.

15. Pub.L. No. 95–555, 92 Stat. 2076, 42 U.S.C. § 2000e (1979 Supp.).

16. The pregnancies and childbirths which are the basis of the claims here happened in 1976, and the payroll actions against which the Commission's order is directed occurred in 1977, the year that the *Group Hospitalization* decision came down.

of fringe benefit plans.[17] To accord retroactive effect to the legislative overruling of *Gilbert* to the detriment of persons acting in good faith reliance on the decision of a court of last resort would raise serious constitutional issues. *City of Kenosha v. Lamson,* 9 Wall. 477, 76 U.S. 477, 19 L.Ed. 725 (1869). In any event, Congress disclaimed any such purpose. Thus, the notion that such congressional action should be construed as retroactively invalidating judicial construction of the local statute · is completely without foundation. Yet that appears to be what the brief for the Commission is arguing.[18]

We also find unconvincing the contention that the legislative history of Title 34 demonstrates that the Council intended that special treatment of pregnancy disabilities was prohibited by its reference to sex discrimination—a factor that we had noted was merely a re-enactment of the earlier regulation. The government is correct in stating that the legislative purpose of the Council was "to parallel the federal Civil Rights Act of 1964." This much is clear from the report of the standing committee recommending Council adoption of the bill (Legislative Report on Title 34, October 15, 1973). The same report also refers with approval to congressional designation of "various federal agencies to define goals, to establish and promulgate guidelines" and states that the local enforcement agencies should develop such procedures. Contrary to the government's contention, there is nothing in this report evidencing an intention to adopt expressly one of the guidelines issued in 1972 by the Equal Employment Opportunity Commission on the subject of pregnancy. This particular guideline contradicted the position previously taken by that agency and was also at odds at the

time of the Council report with current rulings of the Wage and Hour Division, "one of the various federal agencies" also entrusted with administration of the Civil Rights Act.[19] In view of this background of inconsistent agency interpretations, it is impossible to attribute to the Council any legislative intent respecting the issue in the case before us, or to infer that the Council even adverted to the problem.

In addition to assigning as error the Commission's construction of the governing statute, petitioner raised additional objections to certain provisions in the order, including the award of attorney's fees in the amount of $2,610 to counsel for the intervenor-claimants. The authority of the Commission to include the "payment of reasonable attorney's fees" in its order is set forth in 34 DCRR § 33.4 and in the current law, D.C.Code § 1–2553(a)(1)(E) (1981), but depends like all other powers for granting affirmative action in that subsection upon a determination of "an unlawful discriminatory practice" or some other violation of the act. The Commission, of course, did make such a determination in this case, but because in our opinion such determination was error, none of the provisions in its order can be permitted to stand.

*Order vacated.*

---

17. H.R.Rep. 948, 95th Cong., 2nd Sess. *See* 1978 U.S.Code Cong. & Admin.News 4749, 4756.

18. In oral argument, counsel for NBC stated without contradiction that after the effective date of the 1978 congressional amendment, the sick leave and insurance plans were modified so as to comply with the new act. Hence, the provisions in the Commission order requiring

modification of the NBC plan are academic, even were its order enforceable.

19. *See General Electric Co. v. Gilbert, supra,* 429 U.S. at 140–45, 97 S.Ct. at 410–13, for an interesting history of the conflicting administrative rulings on the application of the Civil Rights Act to the subject of pregnancy.