**Pat L. GRANT, Plaintiff-Appellant,**

v.

**GENERAL MOTORS CORPORATION, et al., Defendants-Appellees.**

No. 89-3478.

United States Court of Appeals, Sixth Circuit.

Argued March 15, 1990.

Decided July 20, 1990.

**1304**

Sharon L. Griffin, Toledo, Ohio, Carlin A. Clauss (argued), Madison, Wis., for plaintiff-appellant.

Barry F. Hudgin, Richard M. Kerger (argued), Michael S. Scalzo, Marshall & Melhorn, Toledo, Ohio, for defendant-appellees.

Before GUY and BOGGS, Circuit Judges, and GADOLA, District Judge *.

RALPH B. GUY, Jr., Circuit Judge.

This appeal presents a challenge to the propriety of an employer's "fetal protection policy" that excludes all fertile female employees from foundry jobs involving exposure to specified concentrations of airborne lead. The district court upheld the defendants' fetal protection policy as a necessary safety measure justifying exclusion of all fertile women from certain jobs, and consequently granted summary judgment for the defendants on the plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). Because we find that the district court improperly treated the defendants' fetal protection policy as facially neutral, and therefore defensible as a business necessity, rather than overtly discriminatory, and thus justifiable only as a bona fide occupational qualification (BFOQ), we shall vacate the judgment on the plaintiff's Title VII theory and remand the Title VII claim for consideration under the standards governing overt gender-based discrimination. Since we find no error in the district court's analysis of the Equal Pay Act theory, we affirm the entry of summary judgment for the defendants on that claim.

---

* Honorable Paul V. Gadola, United States District Court for the Eastern District of Michigan, sitting by designation.

## I.

Plaintiff, Pat L. Grant, has worked for defendant General Motors Corporation (GM) at GM's Central Foundry facility in Defiance, Ohio, since March of 1976. During her tenure with GM, the plaintiff has held several positions. Plaintiff Grant once worked as an iron pourer, but she was removed from that position on December 23, 1983, and reassigned to a lower paying job in the foundry pursuant to GM's fetal protection policy.[1] The fetal protection policy—initially instituted by GM in 1952 and periodically revised by the company—was modified in December 1981 to restrict fertile women from holding jobs involving potential exposure to specified levels of airborne lead. Under the fetal protection policy at issue, which GM devised "to protect fetuses which women of childbearing age may be carrying, knowingly or unknowingly," fertile female GM workers are uniformly prohibited from working in foundry areas with air lead levels in excess of 30 micrograms of lead per cubic meter of air;[2] women can only hold such positions by proving infertility. Additionally, fertile women are required to wear respirators and undergo bi-monthly blood tests in order to engage in work involving exposure to airborne lead levels of 10 to 30 micrograms per cubic meter; a total of two blood lead readings in excess of company standards results in disqualification from such jobs.[3] None of these standards or limitations applies to any male workers at the GM foundry.[4]

In response to her reassignment, the plaintiff first lodged several administrative claims, and then filed this action on August 16, 1988.[5] The complaint, which named GM, the GM Central Foundry Division, and three GM supervisory officials as defendants, alleged that the defendants violated Title VII, 42 U.S.C. § 2000e–2, and the Equal Pay Act, 29 U.S.C. § 206(d), by reassigning the plaintiff to a lower paying job strictly on the basis of her gender.[6] The defendants moved for summary judgment on March 8, 1989, interposing the GM fetal protection policy as the sole justification for engaging in the admittedly gender-based exclusion of plaintiff Grant from her previous job as an iron pourer.[7] In support of their motion, the defendants submitted affidavits of former plant safety supervisor John Schuldt and of Dr. Sidney I. Lerner. The plaintiff countered with two affidavits citing a collection of studies discussing the

1. Plaintiff Grant also sought licensure as a hot metal crane operator, but her employer denied her request under the authority of the fetal protection policy.

2. The district court expressed this figure as "30 micrograms per cubic foot of air," yet abbreviated the figure as 30 ug/m[3], an inconsistency apparently derived from mistakes in the affidavit of John Schuldt. The difference in volume between a cubic foot and a cubic meter can hardly be described as *de minimis*. Nevertheless, Dr. Sidney Lerner's affidavit speaks of lead concentrations of 30 micrograms per cubic meter whereas the Schuldt affidavit figures are based on cubic feet. The defendants and the district court disregarded this material inconsistency. We can only surmise that their reference to lead levels in micrograms per cubic foot was erroneous.

3. The threshold established by GM is 20 ug/100 ml. Although the district court's opinion identifies this figure as "20 ug/100 gms," the opinion repeatedly refers to "20 micrograms per deciliter of whole blood."

4. OSHA lead exposure standards, which do not differentiate between male and female workers,

prohibit exposure to "lead at concentrations greater than fifty micrograms per cubic meter of air (50 ug/m[3]) averaged over an 8–hour period." 29 C.F.R. § 1910.1025(c)(1) (1989).

5. The plaintiff did not receive a right-to-sue letter until May of 1988.

6. The plaintiff further alleged that she was subjected to harassment on the job in retaliation for filing her first EEOC complaint in 1984. The district court failed to address this assertion in disposing of the case. Because we must remand the Title VII claim for further consideration of the plaintiff's gender-based discrimination theory, we express no view concerning the proper resolution of the plaintiff's harassment claim, which must be resolved in the first instance by the district court.

7. The defendants' brief explains that "[t]he restrictions the Company placed on Grant's ability to work certain jobs or to work other jobs only when protected by a lead respirator are part of a fetal protection policy at the foundry which was applied to Grant *because she was a female biologically capable of having children.*" (Emphasis added).

impact of lead on men and women in the workplace.

On April 26, 1989, the district court issued an opinion and order granting the defendants' motion for summary judgment. The district court relied heavily upon Dr. Lerner's affidavit, which detailed the effects of lead exposure on men, women, and fetuses. The court rejected the scientific materials cited in the plaintiff's affidavit, and reasoned that Dr. Lerner's affidavit supported the GM policy insofar as the policy sought to protect fetuses by restricting the exposure of fertile women, but not men, to airborne lead. Despite the policy's explicit ban on women performing certain tasks, the district court treated the fetal protection policy as facially neutral and applied disparate impact analysis to resolve the plaintiff's sex discrimination claim. In light of the medical evidence provided by Dr. Lerner, the court deduced that the potential danger to fetuses from lead exposure justified GM's adoption of its fetal protection policy as a matter of "business necessity." Accordingly, the district court granted the defendants' motion for summary judgment in its entirety. This appeal followed. Our review of the district court's ruling on the summary judgment motion is *de novo*. *See, e.g., Storer Communications, Inc. v. National Ass'n of Broadcast Employees and Technicians, AFL–CIO*, 854 F.2d 144, 146 (6th Cir.1988).

## II.

■ Title VII expressly states that "[i]t shall be an unlawful employment practice for an employer … to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's … sex[.]" 42 U.S.C. § 2000e–2(a)(1). It is likewise unlawful under Title VII "to limit, segregate, or classify" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [her] status as an employee because of such individual's … sex[.]" 42 U.S.C. § 2000e–2(a)(2). Thus, Title VII sets forth a sweeping prohibition of overt gender-based discrimination in the workplace. *See, e.g., City of Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711, 98 S.Ct. 1370, 1377, 55 L.Ed.2d 657 (1978) (Title VII's sex discrimination ban prohibits employers from collecting larger pension fund contributions from women than from men even though women on average live longer than men). Under Title VII, overt gender-based discrimination can only be countenanced if sex "is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise[.]" 42 U.S.C. § 2000e–2(e)(1); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989). An employer seeking to justify overt discrimination bears the burden of establishing the BFOQ defense. *See, e.g., Price Waterhouse*, 109 S.Ct. at 1789.

Although Title VII's proscription of sex discrimination conceivably could have been limited to overt gender-based distinctions, the Supreme Court's 1971 decision in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), determined "that a plaintiff need not necessarily prove intentional discrimination in order to establish that an employer has violated [Title VII]." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *see also Griggs*, 401 U.S. at 431, 91 S.Ct. at 853 (Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation."). The Supreme Court tempered this "disparate impact" theory, however, by authorizing adoption of facially neutral policies with discriminatory impact based upon a showing of "business necessity." *Griggs*, 401 U.S. at 431, 91 S.Ct. at 853; *see also Watson*, 108 S.Ct. at 2787; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425–26, 95 S.Ct. 2362, 2375–76, 45 L.Ed.2d 280 (1975). As the Court recently explained, "the employer carries the burden of producing evidence of a business justification for his employment practices. The burden of persuasion, however, remains with the disparate-impact plaintiff." *Wards Cove Packing Co. v. Atonio*, —— U.S. ——, 109 S.Ct.

2115, 2126, 104 L.Ed.2d 733 (1989). Therefore, overt discrimination and the statutorily-defined BFOQ defense must be analytically distinguished from *Griggs*-type disparate impact and the accompanying judicially-created business necessity defense.[8]

The Supreme Court's decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), provided a narrow interpretation of overt sex discrimination under Title VII by holding that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not gender-based discrimination at all." *Id.* at 136, 97 S.Ct. at 408. The *Gilbert* majority reasoned that pregnancy exclusions, though facially neutral, might give rise to disparate impact claims based upon their discriminatory effect.[9] *Id.* at 137, 97 S.Ct. at 408. The Supreme Court reiterated this view in *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), by commenting that the defendant's "decision not to treat pregnancy as a disease or disability for purposes of seniority retention is not on its face a discriminatory policy." *Id.* at 140, 98 S.Ct. at 350. The Court again defined pregnancy-based distinctions as facially neutral yet potentially discriminatory in effect. *See id.* at 141, 144, 98 S.Ct. at 350, 352.

Congress swiftly indicated its disagreement with the rationale of the *Gilbert* and *Satty* decisions by passing the Pregnancy Discrimination Act (PDA), Pub.L. No. 95–555, § 1, 92 Stat. 2076 (1978) (codified at 42 U.S.C. § 2000e(k)).[10] *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 284, 107 S.Ct. 683, 695, 93 L.Ed.2d 613 (1987). Whereas Title VII previously spoke only in general terms of discrimination "because of sex," *see, e.g.*, 42 U.S.C. § 2000e–2(a)(1), the PDA explicitly provides that:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes as other persons not so affected but similar in their ability or inability to work[.]

42 U.S.C. § 2000e(k). Thus, under the PDA, sex discrimination for purposes of Title VII encompasses all distinctions based upon "pregnancy, childbirth, or related medical conditions[.]" *See id.* Accordingly, the PDA transforms distinctions based on pregnancy or potential pregnancy into overt sex discrimination violative of Title VII absent a showing that infertility is a bona fide occupational qualification. The text of the PDA renders this conclusion self-evident, and the legislative history simply fortifies such an interpretation. As the House Report accompanying the PDA explains:

> In using the broad phrase "women affected by pregnancy, childbirth, and related medical conditions," the bill makes clear that its protection extends to the whole range of matters concerning the childbearing process.... Until a woman passes the child-bearing age, she is viewed by employers as potentially pregnant. Therefore, the elimination of discrimination based on pregnancy in these employment practices will go a long way toward providing equal employment opportunities for women, the goal of Title VII of the Civil Rights Act of 1964.

---

8. The Ninth Circuit offered a lucid discussion of this point in *Harriss v. Pan American World Airways, Inc.*, 649 F.2d 670, 674 n. 2 (9th Cir. 1980). *See also EEOC v. Rath Packing Co.*, 787 F.2d 318, 327–28 n. 10 (8th Cir.), *cert. denied*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986).

9. The *Gilbert* majority found that the plaintiffs failed to adequately demonstrate "gender-based effects[,]" *Gilbert*, 429 U.S. at 137, 97 S.Ct. at 409, and the Court therefore ruled that the disability-benefits plan did not violate Title VII.

10. The legislative history of the PDA specifically embraces the dissenting opinions of Justices Brennan and Stevens in *Gilbert* as "correctly" interpreting Title VII. H.R.REP. NO. 95–948, 95th Cong., 2d Sess. 2, *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 4749, 4750; *see also California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 277 n. 6, 107 S.Ct. 683, 687 n. 6, 93 L.Ed.2d 613 (1987).

H.R.REP. NO. 95–948, 95th Cong., 2d Sess. 5–7, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 4749, 4753–59. Moreover, the Supreme Court's 1983 decision in *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983), conclusively held that the PDA "not only overturned the specific holding in *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), but also rejected the test of discrimination employed by the Court in that case." *Id.* at 676, 103 S.Ct. at 2627. Consequently, as the Court unequivocally stated in *Newport News,* "[t]he Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy [or any related medical condition] is, *on its face,* discrimination because of her sex." *Id.* at 684, 103 S.Ct. at 2631 (emphasis added).

■ The PDA, its legislative history, and the Supreme Court's *Newport News* decision inexorably lead to the conclusion that fetal protection policies which disqualify fertile women from various employment opportunities must be characterized as facially discriminatory under Title VII. Nevertheless, the Fourth Circuit circumvented this seemingly ineluctable conclusion in *Wright v. Olin Corp.,* 697 F.2d 1172 (4th Cir.1982), by essentially overlooking the PDA.[11] The *Wright* court acknowledged the distinction between overt discrimination and disparate impact, *see id.* at 1183–84, asserted that "the fact situation" presented by fetal protection policies "does not fit with absolute precision" into either theory, *id.* at 1184, and proceeded to design its own variation on the disparate impact model as the methodology for resolving the plaintiffs' Title VII sex discrimination claim. The Fourth Circuit conceded that "the 'facial neutrality' of Olin's fetal vul-

nerability program might be subject to logical dispute," *id.* at 1186, but nonetheless offered the following justification for selecting (and then modifying) the disparate impact model:

The inappropriateness of applying the overt discrimination/b.f.o.q. theory of claim and defense—or, more accurately, of treating it as the exclusively applicable, hence dispositive, theory—is that, properly applied, it would prevent the employer from asserting a justification defense which under developed Title VII doctrine it is entitled to present.

*Id.* at 1185 n. 21. "In other words, this *must* be a disparate impact case because an employer couldn't win it as a disparate treatment case." *International Union, UAW v. Johnson Controls, Inc.,* 886 F.2d 871, 910 (7th Cir.1989) (Easterbrook, J., dissenting) (emphasis in original), *cert. granted,* — U.S. —, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990). The *Wright* court laid out a seven-point approach to analysis of fetal protection policies including a modified, rebuttable business necessity defense, *see Wright,* 697 F.2d at 1190–92, and ultimately remanded the case for further consideration under the framework created in the opinion.

In the wake of the Supreme Court's *Newport News* decision, the Eleventh Circuit considered the Title VII claim of a female x-ray technician who was fired when she became pregnant. *See Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543 (11th Cir. 1984). While the *Hayes* case did not involve a fetal protection policy *per se,* the hospital interposed concern for fetal safety as the basis for discharging the plaintiff. The Eleventh Circuit distanced itself from the Fourth Circuit's decision to cast the employer's practice as facially neutral, *id.* at 1546 n. 2, and opined that "the Pregnan-

---

**11.** The *Wright* court only mentioned the PDA in passing, and referred to treatment of the fetal protection policy as overt gender-based discrimination pursuant to the PDA as "conceptually unsound for reasons that will appear." *Wright,* 697 F.2d at 1184 n. 17. The "reasons that … appear[ed]" were policy-based, including the presumption that "the safety of unborn children is more appropriately analogized to the safety of personal service customers of the business." *Id.*

at 1189. The Fourth Circuit's election to give short shrift to the PDA might be explained by the fact that *Wright* was decided six months before the Supreme Court handed down its decision in *Newport News. Cf. Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1546 n. 2 (11th Cir.1984) (*Wright* "did not make clear … whether it was applying pre- or post-Pregnancy Discrimination Act principles.").

cy Discrimination Act mandates that a pregnancy-based rule can never be 'neutral.' " [12] *Id.* at 1547. Having eschewed the Fourth Circuit's basic premise in *Wright,* the Eleventh Circuit embarked upon an independent analytical course. *Cf. id.* at 1548 n. 8 ("[W]e approach this case differently than did the [*Wright*] court[.]"). The *Hayes* court designed a system where the employer must initially demonstrate "(1) that there is a substantial risk of harm to the fetus or potential offspring of women employees from the women's exposure, either during pregnancy or while fertile, to toxic hazards in the workplace, and (2) that the hazard applies to fertile or pregnant women, but not to men." [13] *Id.* at 1548. After specifying the quantum of proof required to meet this threshold burden, *see id.* at 1548–49, the Eleventh Circuit outlined the consequence of the employer's inability to carry its burden: "If an employer fails to overcome the burden of proving that its policy is not facially discriminatory, then its only defense is BFOQ." *Id.* at 1549. If the employer meets this threshold burden, however, the case should be analyzed under traditional disparate impact principles. *Id.* at 1552. The *Hayes* court,

therefore, advocated a fact-specific, case-by-case approach to classifying fetal protection policies as either facially discriminatory or facially neutral. In the particular case at hand, the Eleventh Circuit affirmed the judgment for the plaintiff under its newly-adopted standards. *Id.* at 1554.

The Seventh Circuit took up the Title VII issues raised by fetal protection policies in a 1989 *en banc* decision that produced several opinions. [14] *See Johnson Controls,* 886 F.2d 871. The seven-judge majority, identifying an obligation "to avoid inflexible application of judicially devised proof patterns in cases that present factual circumstances different from those encountered previously[,]" *id.* at 883 (citing *Wright,* 697 F.2d at 1184), chose to follow the Fourth Circuit's *Wright* decision in conceptualizing fetal protection policies as susceptible to disparate impact analysis—including the business necessity defense. [15] *See Johnson Controls,* 886 F.2d at 886–87. The *en banc* majority then undertook a lengthy analysis of the fetal protection policy before it and found the policy adequately warranted as a "business necessity." *Id.* at 887–93. Not content to dispose of the case under the

**12.** Indeed, the *Hayes* court stated that it "tends to agree [with the employee] that this is a facial discrimination case[.]" *Hayes,* 726 F.2d at 1548.

**13.** The *Hayes* court explained that it "borrow[ed] these requirements from the showing of 'business necessity' required in *Wright*" despite the two courts' admittedly divergent approaches to the issue. *Hayes,* 726 F.2d at 1548 n. 8.

**14.** Johnson Controls adopted a fetal protection policy applicable "to work environments in which any current employee has recorded a blood lead level exceeding 30 ug/dl during the preceding year or in which the work site has yielded an air sample during the past year containing a lead level in excess of 30 ug per cubic meter." *Johnson Controls,* 886 F.2d at 876. The Johnson Controls policy allowed for transfer "to another job in Johnson's employ without ... a loss of pay or benefits." *Id.*

**15.** The *Johnson Controls* majority relied upon a 1988 EEOC policy statement as additional support for its approach. *See Johnson Controls,* 886 F.2d at 885–87 (citing and discussing *EEOC: Policy Statement on Reproductive and Fetal Hazards Under Title VII,* Fair Emp. Prac. Manual (BNA) 401:6013 (Oct. 3, 1988) (hereinafter

"EEOC Statement")). The EEOC Statement explains that "[a] policy that expressly excludes women on the basis of pregnancy or capacity to become pregnant *on its face* discriminates against women on the basis of sex in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e–2 (1982)." *See* EEOC Statement, Fair Emp. Prac. Manual (BNA) 401:6014 (emphasis added). The EEOC Statement concludes that "[a]lthough the BFOQ defense is normally the only one available in cases of overt discrimination, the Commission follows the lead of every court of appeals to have addressed the question ... that the business necessity defense applies" to fetal protection policy cases. *Id.* at 401:6014–15. In the wake of *Johnson Controls,* the EEOC repudiated this position and concluded that "BFOQ is the better approach." *See EEOC: Policy Guide on United Auto Workers v. Johnson Controls,* Fair Emp. Prac. Manual (BNA) 405:6800 (Jan. 24, 1990). As the Commission explained, "it is more consistent with Title VII's structure and purpose to allow a defendant in a case challenging a facially discriminatory fetal protection policy only the statutory defense of proving that sex is a 'bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.' " *Id.* (quoting 42 U.S.C. § 2000e–2(e)(1)).

disparate impact framework, the *Johnson Controls* majority offered a thorough defense of the policy as a BFOQ. *See id.* at 893–901. Much of the majority's BFOQ discussion provides provocative insight into why the *Wright* court was incorrect in assuming that an employer necessarily would lose if forced to defend a fetal protection policy as a BFOQ. Thus, the *Johnson Controls* majority offered no new reason to scrutinize fetal protection policies under the business necessity defense, but the majority's BFOQ discussion logically undermined the pragmatic rationale furnished by the Fourth Circuit in *Wright* for permitting employers to utilize the business necessity defense. *Cf. Wright,* 697 F.2d at 1185 n. 21 ("[T]he overt discrimination/b.f.o.q. theory of claim and defense ... would prevent the employer from asserting a justification defense which under developed Title VII doctrine it is entitled to present.").

The four dissenters in *Johnson Controls*—Judges Cudahy, Easterbrook, Flaum, and Posner—all determined that fetal protection policies constitute overt gender-based discrimination justifiable only under the BFOQ defense.[16] Judge Posner observed that the Fourth and Eleventh Circuits, when confronted with the possibility that employers could not support their fetal protection policies by resorting to the BFOQ defense, "stitch[ed] a new defense expressly for fetal protection cases." *Johnson Controls,* 886 F.2d at 903 (Posner, J., dissenting). Judge Easterbrook likewise identified the impropriety of interjecting policy considerations into a "statutory" case, *id.* at 908 (Easterbrook, J., dissenting), emphatically reasoning that "[i]f the rigors of the BFOQ suggest the need for a fresh approach, that is a job for another branch." *Id.* at 910 (Easterbrook, J., dissenting). Judge Easterbrook traced the development of gender-based discrimination from *Gilbert* through the PDA and *Newport News* to the conclusion that fetal protection policies amount to overt sex discrimination authorized only if satisfactory

under the BFOQ defense. *See, e.g., id.* at 909 (Easterbrook, J., dissenting).

We agree with the view of the dissenters in *Johnson Controls* that fetal protection policies perforce amount to overt sex discrimination, which cannot logically be recast as disparate impact and cannot be countenanced without proof that infertility is a BFOQ. To hold otherwise would be to usurp congressional power to regulate pregnancy discrimination on the basis of public policy. *See, e.g., Johnson Controls,* 886 F.2d at 908 (Easterbrook, J., dissenting). Our task is one of interpretation, not legislation. Title VII as amended by the PDA defines both the contours of overt sex discrimination and the single defense to such conduct in clear terms; plaintiff Grant has alleged a claim of overt discrimination that her employer may justify only through the BFOQ defense.

## III.

 Having determined that the defendants in this case must rely upon the BFOQ defense to validate their fetal protection policy, we must ascertain the boundaries of the BFOQ defense in this context. Title VII speaks of a bona fide occupational qualification as "reasonably necessary to the normal operation of [a] particular business or enterprise[.]" 42 U.S.C. § 2000e–2(e)(1). In *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court explained that "the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Id.* at 334, 97 S.Ct. at 2729. The Court, however, indicated that "an employer could rely on the bfoq exception ... by proving 'that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.'" *Id.* at 333, 97 S.Ct. at 2729 (quoting *Weeks v. Southern Bell Tel.*

---

**16.** Judge Cudahy described *Wright,* the progenitor of Title VII fetal protection policy analysis, as "result-oriented gimmickery[.]" *Johnson Controls,* 886 F.2d at 902 (Cudahy, J., dissent-

ing). Judge Posner called the *Wright* approach "legerdemain [that] is as unnecessary as it is questionable." *Id.* at 903 (Posner, J., dissenting).

*& Tel. Co.,* 408 F.2d 228, 235 (5th Cir. 1969)).

In *Johnson Controls,* Judge Cudahy demonstrated the applicability of the *Weeks* standard to fetal protection policy cases by articulating the BFOQ requirement as follows: "the employer must demonstrate 'a factual basis for believing that all or substantially all [excluded] women would be unable to perform safely [i.e., without inordinate risk to third parties, including fetuses] and efficiently the duties of the job involved.'" *Johnson Controls,* 886 F.2d at 902 n. 1 (Cudahy, J., dissenting) (quoting *Weeks,* 408 F.2d at 235). The *Johnson Controls* majority applied essentially the same standard derived from *Weeks* in discussing the BFOQ defense. *See Johnson Controls,* 886 F.2d at 897. We find that the straight-forward BFOQ test defined by Judge Cudahy aptly takes into account the interests of all parties affected by fetal protection policies,[17] and we adopt that standard as the method for resolving this case on remand. We note Judge Posner's admonition that "[w]hether a particular policy is lawful is a question of fact, and since the burden of proof is on the defendant it will be the rare case where the lawfulness of such a policy can be decided on the defendant's motion for summary judgment." *Johnson Controls,* 886 F.2d at 906 (Posner, J., dissenting). We hasten to add that the employer should be given a full opportunity to establish a factual basis for believing that its exclusionary policy is a necessary precondition to a safe and efficient workplace. *Cf. id.* at 904 (Posner, J., dissenting) ("An employer might be validly concerned on a variety of grounds both practical and ethical with the hazards of his workplace to the children of his employees."). With these caveats in mind, we VACATE the judgment for the defendants on the plaintiff's Title VII sex discrimination claim and REMAND the

matter for consideration under the BFOQ standard that we have adopted.

IV.

■ Our conclusion regarding the district court's disposition of the plaintiff's Title VII claim has no bearing upon the district court's treatment of plaintiff Grant's Equal Pay Act claim. The district court granted summary judgment for the defendants on the Equal Pay Act claim because of the plaintiff's concession that she always received the same compensation as her male colleagues for the jobs she performed. We agree that GM's decision to transfer the plaintiff to a lower paying job, standing alone, does not support an Equal Pay Act claim.

The Equal Pay Act prohibits an employer from "paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]" 29 U.S.C. § 206(d)(1). We recently explained that the Equal Pay Act "mandates equal pay for equal work[.]" *International Union, UAW v. State of Michigan,* 886 F.2d 766, 768 (6th Cir.1989). In this case, the plaintiff concedes that she received the same wages as those men performing the tasks that she performed after her reassignment. Her complaint is that she did not receive the same pay in the job to which she was reassigned as the men who remained in the iron pourer positions. Such a claim clearly is beyond the purview of the Equal Pay Act. Indeed, if we were to grant the plaintiff the relief she seeks, she would receive a higher wage than the men working in the job to which she was reassigned, a result contrary to the Equal Pay Act's terms. While the plaintiff's transfer to a lower paying job pursuant to

17. In a leading article on fetal protection policies, Professor Wendy Williams discussed the tension between the employer's "legitimate interest in fetal health that should be allowed some form of expression without liability under the equal opportunity laws" and the interest "women workers have ... in equal employment opportunity that is threatened by employer exclusionary policies." Williams, *Firing the Woman to Protect the Fetus: The Reconciliation of Fetal Protection with Employment Opportunity Goals under Title VII,* 69 Geo. L.J. 641, 653 (1981).

GM's fetal protection policy may have violated Title VII, her reassignment in and of itself cannot support an Equal Pay Act claim. The district court's determination to this effect is AFFIRMED.