**Margaret J. AHMAD, Plaintiff,**

v.

**LOYAL AMERICAN LIFE INSURANCE COMPANY, Defendant.**

**Civ. A. No. 89–0778–RV.**

United States District Court, S.D. Alabama, S.D.

July 8, 1991.

Kirk C. Shaw, Mobile, Ala., for defendant.

Melissa A. Posey, C.S. Chiepalich, Mobile, Ala., for plaintiff.

## ORDER

VOLLMER, District Judge.

Plaintiff, Margaret J. Ahmad, brought this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). Plaintiff contends that defendant, Loyal American Life Insurance Company ("Loyal American" or the "Company"), discriminated against her because of her pregnancy in withdrawing its offer of employment to plaintiff in June 1987. The Company contends that it withdrew its offer of employment because plaintiff required an early leave of absence from employment due to her pregnancy and that it was the timing and anticipated effect of her absence, not her pregnancy, that caused the Company's withdrawal of its offer of employment.

A trial was held in this case on Tuesday, July 2, 1991. After due and proper consideration of the arguments of counsel, and of all evidence presented by counsel, which evidence was not excluded by the court, the court issues the following findings of fact and conclusions of law.

### Findings of Fact

1. The Company is an insurance company headquartered in Mobile, Alabama. It markets a variety of health, accident, and life insurance policies. A major portion of its business is cancer insurance.

2. Plaintiff is a 31 year old, married female. On or about Friday, June 5, 1987, Mrs. Ahmad applied to the Company for the position of Medical Claims Examiner, a position that would have called for plaintiff to evaluate and resolve claims on the Company's cancer health insurance policies. Mrs. Ahmad learned of this opportunity through an employee of the Company.

3. Prior to applying for employment with the Company, plaintiff attended the University of South Alabama in Mobile, Alabama. Mrs. Ahmad had taken courses during each of the ten quarters preceding her applying for employment with the Company.

4. Earlier in 1987, the Company had acquired two other insurance companies, Founders Life and American Defender Life, of Tampa, Florida and their 139 insurance plans and concomitant claims. The acquisition increased substantially the total number of medical claims handled by the Company, from 24,098 in 1986 to 32,750 in 1987, and from 13,782 in the first six months of 1987, to 18,968 in the last six months of 1987.

5. At the same time its workload was increasing, however, the Company's medical claims department was losing examiners. Previously, in early 1987, the Company lost an experienced medical examiner. Additionally, a new Claims Examiner Trainee, hired in February 1987, terminated in March. Two Company employees—Mirlean Faircloth and George Lyles—testified that at the time Mrs. Ahmad applied for the position of Medical Claims Examiner, the Company was in "desperate need" of Examiners.

6. In addition to the foregoing, the Company undertook to automate its claims processing by utilizing computers. This automation effort began on approximately May 1, 1987, but had to be discontinued after a few weeks because problems with the system were causing a backlog in claims processing. This was the situation when Mrs. Ahmad applied to the Company in June 1987, for employment as a Medical Claims Examiner.

7. On June 5, 1987, Mrs. Ahmad was interviewed by Mirlean Faircloth, Supervisor of the Accident and Health Claims Department of the Company. Mrs. Ahmad told Mrs. Faircloth that she previously had worked for Prudential Insurance Company in California ("Prudential") as a "calculator," determining Prudential's payments on

claims, but had had difficulty in that position.

8. Mrs. Faircloth testified that she was not impressed with Mrs. Ahmad after the initial interview because of Mrs. Ahmad's admitted previous difficulty and lack of confidence in handling claims for Prudential.

9. In fact, Mrs. Ahmad's employment at Prudential had ended over four years before Mrs. Ahmad's interview with the Company. Mrs. Ahmad had been employed by Prudential for approximately two and one-half years, from September 15, 1980, until February 11, 1983. Mrs. Ahmad began with Prudential as a file clerk and served in that position for approximately eight months. She then was trained for a period of three to six weeks as a "calculator" to determine Prudential's payments on claims. After working as a "calculator" for a period of two or three weeks, Mrs. Ahmad was transferred, at her request, to telephone duty answering policyholder's inquiries. Mrs. Ahmad remained in that position for approximately one and one-half years before she was laid off by Prudential.

10. Mrs. Ahmad testified that Mrs. Faircloth had discussed the Company's training process with her and had told plaintiff that the process usually took five to six months. Mrs. Ahmad further testified that Mrs. Faircloth told plaintiff that the training process might not take plaintiff six months because of plaintiff's prior work experience.

11. Not being totally confident with plaintiff and because of plaintiff's prior work experience, Mrs. Faircloth asked Mr. Lyles to interview Mrs. Ahmad. Pursuant to that request, Mr. Lyles then interviewed Mrs. Ahmad. Mrs. Faircloth was present at the interview. At the conclusion of the interview, Mr. Lyles and Mrs. Faircloth told Mrs. Ahmad that they would make a decision and get back to her.

12. Mrs. Faircloth then checked with Prudential in California concerning Mrs. Ahmad's employment with that company; Prudential only disclosed the dates of Mrs. Ahmad's employment to Mrs. Faircloth.

13. Although both Mr. Lyles and Mrs. Faircloth were concerned about Mrs. Ahmad's ability successfully to perform as a Medical Claims Examiner, based upon Mrs. Ahmad's own evaluation of her performance as a "calculator" for Prudential, they agreed, because of the Company's urgent need for additional Medical Claims Examiners, to offer Mrs. Ahmad employment.

14. Mrs. Faircloth called Mrs. Ahmad on Saturday, June 6, 1991, and offered Mrs. Ahmad employment as a Medical Claims Examiner.

15. On Monday, June, 8, 1987, Mrs. Ahmad reported for work. She met with Mrs. Faircloth and told her, for the first time, that she was four months pregnant. Mrs. Faircloth explained that Mrs. Ahmad's absence to deliver a baby would interrupt the lengthy training period required for the job and that she would have to consult with Mr. Lyles, her superior, as to what to do.

16. Both Mr. Lyles and Mrs. Faircloth testified that the training period for Medical Claims Examiners at the Company usually takes five to six months, and sometimes longer before an Examiner is allowed to pay small claims without supervision. Also, each testified that in one rare circumstance, the Company hired a Medical Claims Examiner whose training period lasted only three months. They further testified, however, that at least in one instance, someone who had a lengthy history (13 years) as a Claims Examiner for Blue Cross and Blue Shield and, subsequently, was hired as a Medical Claims Examiner by the Company, essentially was unable to work without supervision throughout her one year tenure with the Company. According to Mr. Lyles and Mrs. Faircloth, it usually takes one to one and one-half years before a Medical Claims Examiner reaches peak efficiency.

17. In June 1987, there were 223 different insurance plans with which a Medical Claims Examiner had to deal. Examiners had to learn to interpret the provisions in those insurance plans, learn applicable medical terminology and to read hospital records to determine if the claim was covered, learn the numerous codes required in

processing claims, how to use the computer terminal, how to extract information from claims files, how to handle calls from policyholders, and other matters.

18. Both Mr. Lyles and Mrs. Faircloth testified as to the importance of the Medical Claims Examiner's position. Moreover, Mr. Lyles testified as to the need for careful training of Examiners, particularly since, according to Mr. Lyles, an Examiner's mistakes can create potentially huge liabilities for insurance companies, even for relatively small claims.

19. Based on their past experience with other Medical Claims Examiners, it was the opinion of Mr. Lyles and Mrs. Faircloth that the timing of plaintiff's pregnancy leave of absence would greatly interfere with Mrs. Ahmad's training and her being able to process claims without supervision, with the result that Mrs. Ahmad would have to undergo a period of retraining following her return to work.[1]

20. After Mrs. Faircloth consulted with Mr. Lyles, she informed Mrs. Ahmad that the timing of her anticipated leave of absence would greatly interfere with her training and her being able to process claims on her own. She explained that the Company needed someone who could be trained and continue on in the job that, under the circumstances, the Company would not be able to employ Mrs. Ahmad as a Medical Claims Examiner.

21. Mrs. Ahmad began to cry and remained in Mrs. Faircloth's office for some time before she left. During that time, Mrs. Ahmad remarked that "I always get in trouble when I tell the truth."

22. On the following day, Mrs. Ahmad called both Mrs. Faircloth and Mr. Lyles and, unbeknownst to either of them, recorded their telephone conversations. Mrs. Ahmad inquired again as to the reason she was not hired and was told, in essence, the

same thing as Mrs. Faircloth had discussed with her on the preceding day.

23. On June 16, 1987, and attorney for Mrs. Ahmad wrote Loyal American forwarding a Charge of Discrimination which he stated had been forwarded to the Equal Employment Opportunity Commission.

24. On June 26, 1987, Mr. Lyles called Mrs. Ahmad on the telephone and offered employment to her as a Medical Claims Examiner. No conditions were placed on the Company's offer. This oral offer of employment was confirmed in a letter, dated that same day, which stated:

> On behalf of Loyal American Life Insurance Company, I hereby offer you employment as a Claims Examiner Trainee, effective immediately, upon the terms stated to you earlier this month. Please report to work on Monday, June 29, 1987 at 8:00 A.M. If you are unable to report at that time, please call me and advise me when you can report to work.

In her telephone conversation with Mr. Lyles on June 26, Mrs. Ahmad declined to respond to the Company's offer of employment until after she had consulted with her attorney. Mrs. Ahmad never responded to the Company. She also did not appear for work on June 29 or otherwise advise the Company when she could report to work.

25. Mrs. Ahmad testified that she was still willing to work for the Company as late as June 16, 1987. She further testified that Mr. Lyles "scared" her when he called her on June 26, 1987, and made her an unconditional offer of employment.

26. Mr. Lyles testified that Mrs. Ahmad's filing of an EEOC complaint was the only event occurring between June 8 and June 26, 1987, which prompted the Company's reconsideration of the action taken with respect to the plaintiff. He also testified, however, that he never indicated to plaintiff that the subsequent offer of employment, made on June 26, 1987, was at all conditioned on Mrs. Ahmad's dropping

---

1. At trial, plaintiff presented two witnesses, each of whom testified as to their lack of need for retraining following their return from maternity leave. Only one of those witnesses—Laurie Craver—worked both prior and subsequent to her leave of absence as a Medical Claims Exam-

iner. Despite her limited experience as a Claims Examiner, the court does not consider that Mrs. Craver's position was similar or analogous to the position in which plaintiff would have been had plaintiff been hired by the Company.

her EEOC complaint. In fact, no mention of the EEOC complaint was made by Mr. Lyles to the plaintiff, a fact which plaintiff confirmed.

27. Mrs. Ahmad returned to college that summer and took one course. She worked for a telephone solicitation business for two days, but quit because she did not like the hours or the location. Subsequently, she worked for another phone solicitation company for two or three weeks. Mrs. Ahmad delivered her child on November 11, 1987.

28. In January 1988, Mrs. Ahmad resumed her education at the University of South Alabama. She took a regular load of courses during each quarter (including the summer quarters) thereafter until she graduated in June 1991.

29. Plaintiff obtained a right-to-sue letter from the EEOC in July 1989, and filed this action on October 5, 1989.

30. The evidence did not establish that Mrs. Ahmad was denied employment because of her sex or pregnancy. The evidence established that the Company withdrew its initial offer of employment because of the expectation that the early leave of absence which plaintiff required would have adversely affected plaintiff's training and value to the Company. At the point of her leave of absence, plaintiff likely just would have been beginning to pay small claims without close supervision. She would not have gained the experience necessary to leave the position and return to it without the prospect of a substantial loss of skills and need for retraining. This was a reasonable expectation given her admitted difficulty as a calculator for Prudential.

### Conclusions of Law

1. This court has jurisdiction over the parties and over the subject matter of this action.

2. The court concludes that this case is properly analyzed under a "pretextual disparate treatment" analysis. In other words, plaintiff contends that the Company's apparent facially neutral policy of not hiring anyone as a Medical Claims Examiner who is required to take a leave of absence shortly after being hired is a "pretext" for intentional discrimination against plaintiff because of her pregnancy.

3. To prevail under this theory, plaintiff must establish a prima facie case of disparate treatment. Defendant then may articulate "a legitimate, nondiscriminatory reason" for its action. Plaintiff then has the burden of proving, by a preponderance of the evidence, that the articulated reason was a pretext for discrimination and that the true reason was intentional discrimination. The burden of proof remains on the plaintiff at all times. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). "The controlling factual inquiry in a Title VII [disparate treatment] case ... is whether the employer intentionally discriminated against the employee, treating him [or her] less favorably than others because of his [or her] race [or sex]." *Sylvester v. Callon Energy Services, Inc.*, 724 F.2d 1210, 1213 (5th Cir.1984). The court concludes that the Company did not intentionally discriminate against Mrs. Ahmad on the basis of her sex or pregnancy.

4. Plaintiff having met her burden of establishing a *prima facie* case in this instance, the focus shifts to the Company to articulate a legitimate, nondiscriminatory reason for the action taken. This burden on the defendant is "exceedingly light", *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir.1988), and is one of production and not persuasion, as the ultimate burden of proving by a preponderance of evidence the existence of purposeful discrimination remains on the plaintiff at all times. *Jones v. Gerwens*, 874 F.2d 1534, 1538–39 (11th Cir.1989).

5. Any legitimate, nondiscriminatory reason offered by a defendant in a Title VII case is sufficient to rebut completely the *prima facie* inference. *Mauter v. Har-*

*dy Corp.*, 825 F.2d 1554 (11th Cir.1987); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir.1984).

6. Defendant Loyal American met its burden of production by offering as the reason for its withdrawal of its employment offer to plaintiff the effect that plaintiff's requirement of an early leave of absence would have on her "learning curve" and her value to the Company.

7. Defendant having met its burden of production, the plaintiff, in order to prevail on her claim, had to prove by a preponderance of the evidence that the reason offered by defendant was a mere pretext for discrimination against the plaintiff on the basis of sex or pregnancy. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

8. Based on all of the testimony, the credibility of the witnesses, and the trial exhibits, the court concludes that plaintiff has failed to prove by a preponderance of the evidence that defendant's proffered reason for withdrawing its offer of employment to plaintiff was pretextual. Moreover, the court concludes that the company did not intentionally discriminate against Mrs. Ahmad on the basis of her sex or pregnancy.[2]

9. Even if, however, the court were to conclude that plaintiff had met her burden of proving that the Company's stated reason for not hiring plaintiff was pretextual and that the true reason for the Company's action was intentional discrimination, the court would hold that plaintiff is not entitled to an award of backpay for the

**2.** Analyzing this case as a "disparate impact" case, the court reaches the same conclusion. In a disparate impact case, the plaintiff contends that an otherwise neutral policy has a disproportionate impact on a group protected from discrimination under Title VII. An affirmative defense to a *prima facie* case of disparate impact is "business necessity." *See Hayes v. Shelby Memorial Hospital,* 726 F.2d 1543, 1546–67 (11th Cir.1984).

In the case at bar, there has been only one instance in which an applicant for Medical Claims Examiner has disclosed a need for leave of absence during the period of her training. Plaintiff was that one. Defendant's representatives have testified that they would take the same action if a male employee applied for the position, but informed the Company that he required an early leave of absence to take an extended honeymoon in Europe. In that case, defendant would not hire the applicant.

Under the circumstances, it is highly questionable that plaintiff has proved a *prima facie* case of disparate impact in this instance. However, even assuming that defendant has proven her *prima facie* case, the court is satisfied that defendant's policy is justified as a "business necessity." The United States Supreme Court has clarified that the employer's burden of justification in disparate impact cases is comparable to that in disparate treatment cases—it must only *produce* evidence of a legitimate business justification once the plaintiff proves a *prima facie* case. "[T]he dispositive issue is whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer." There is no requirement that the challenged practice be "essential" or "indispensable" to the employer's business for it to pass muster. *Id.*

Defendant Loyal American produced evidence of a business justification for its employment practice herein. It showed that at the time of

plaintiff's application, it had acquired two additional insurance companies and was handling claims on a total of 223 insurance plans from its Mobile claims office. The number of claims had increased substantially. Yet, defendant had lost some of its staff of Medical Claims Examiners. The problem was compounded by an unsuccessful attempt in May by the Company to automate its claims processing with computers. Management had a legitimate business justification in seeking to employ someone as an examiner who could help relieve the burden on the Claims Department in the immediate future.

Further, the Company produced evidence of the significant period of time, energy, and expense involved in training a Medical Claims Examiner to the point where she (or he) could function without close supervision and be of benefit to the Company. Evidence disclosed that this training and supervised-claims handling period lasted at least five to six months, and that over a year of experience was required for an examiner to reach peak efficiency. Even then, the Company's investment did not always bear dividends. One Examiner hired in June 1987, who had thirteen years claims-handling experience with another insurance company, was not able to master Loyal American's unique policies and procedures after having been on the job for 12 months, when she left the Company.

After hearing all of the testimony and viewing the exhibits presented to the court, and evaluating the credibility of the witnesses, the court concludes that Loyal American's practice of not hiring individuals as Medical Claims Examiners who must take a leave of absence soon after hire, does serve, in a significant way, its legitimate goals as an insurance company. Plaintiff has failed to meet her burden of persuasion that defendant has discriminated against her, as a pregnant female, on a "disparate impact" basis.

period of time beginning on June 26, 1987. The undisputed evidence adduced at trial was that defendant made an unconditional offer of employment to plaintiff on June 26, 1987. Although defendant's admitted reason for "reconsidering" its previous action with respect to Mrs. Ahmad was the filing by plaintiff of an EEOC complaint, defendant further testified that the offer of employment made on June 26, 1987, was not conditioned in any way on plaintiff's dropping the EEOC complaint. Plaintiff adduced no evidence to refute that testimony.

Accordingly, judgment is due to be entered in favor of Loyal American and against Mrs. Ahmad.

It is so ORDERED.